FILED
2014 Mar-27  PM 02:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **BARRY L. THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:12-cv-04021-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner, Social Security** | ) | |
| **Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

## I. INTRODUCTION

On April 9, 2007, claimant Barry L. Thompson applied for a period of disability and disability insurance benefits under Title II of the Social Security Act, (R. 66, 92–99), and supplemental security income under Title XVI of the Social Security Act, (R. 67, 100–04). The claimant alleges disability commencing on December 17, 2003 because of symptoms related to iliopsoas tendon and chronic hip and back pain.[1] (R. 92, 112, 68–69). The Commissioner denied both claims. (R. 66–69). The claimant subsequently filed a timely request for a hearing before an Administrative Law Judge on August 28, 2007. (R. 70). The ALJ held the hearing on February 4, 2010. (R. 89, 90, 39–64). In a decision dated March 10, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was thus ineligible for disability benefits and supplemental security income. (R. 22–33, 1). On October 5, 2010, the Appeals

---

[1] The claimant also asserts impairments of hypertension, obesity, and personality disorder, although the claimant did not raise these in his initial application. (R. 68–69).

1

Council denied the claimant's request for review. (R. 1–4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.

The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court will AFFIRM the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: (1) whether substantial evidence supports the ALJ's Residual Functional Capacity determination, and (2) whether the ALJ failed to properly consider the claimant's severe impairments of record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. Similarly, the court will affirm only those factual determinations that are supported by substantial evidence. *Id.* at 1000. "Substantial evidence" is "more than a mere scintilla" of evidence, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but "less than a preponderance," *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). An opinion is supported by substantial evidence if it demonstrates "such relevant evidence as a reasonable person would accept as

2

adequate to support a conclusion." *Moore*, 405 F.3d at 1211; *see also Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARDS

Under federal law, a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, supbt. P, app. I?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

A Residual Functional Capacity assessment involves determining the claimant's ability to do work in spite of his impairments in consideration of all relevant evidence. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b). The law defines light work as "lifting no more than 20 pounds with frequent lifting or carrying of objects weighing up to 10 pounds"; "a good deal of walking or standing"; or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

A. THE NECESSITY OF MEDIAL EVIDENCE IN MAKING A RESIDUAL FUNCTIONAL CAPACITY DETERMINATION

Because the hearing before an ALJ is not an adversarial proceeding, the ALJ has a basic obligation to develop a full and fair record before determining a claimant's Residual Functional Capacity. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). Developing a full and fair record, however, does not require an ALJ to secure a medical source opinion regarding the claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); *see also Langley v. Astrue*, 777 F. Supp. 2d 1250, 1261 (N.D. Ala. 2011) ("The failure to include [an RFC assessment from a medical source] at the State agency level does not render the ALJ's RFC assessment invalid."); *Green v. Soc. Sec. Admin*, 223 F. App'x 915, 923–24 (11th Cir. 2007). Because the overall RFC determination is "based on *all* the relevant evidence in [the claimant's] case record," 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (emphasis added), the ALJ can fulfill his responsibility to

develop the record even without a medical source opinion. Thus, as long as the ALJ's determination is based on substantial evidence, the absence of an RFC assessment by a medical source will not render the ALJ's RFC determination invalid. *Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 924 (11th Cir. 2007).

While the failure of an ALJ to rely upon an RFC assessment from a medical source is not enough to invalidate the ALJ's overall RFC determination, the ALJ's duty to fully develop the record may require the ALJ to order a consultative examination if "necessary to make an informed decision." *Smith v. Commissioner*, 501 F. App'x. 875, 878 (11th Cir. 2012). Federal regulations provide that such an evaluation is appropriate "to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination." 20 C.F.R. §§ 404.1519a(b), 416.919a(b). Ultimately, however, the general rule remains: if substantial evidence supports the ALJ's decision, the ALJ does not err in denying a request for a consultative examination. *Holladay v. Bowen*, 848 F.2d 1206, 1209–10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

### B. DETERMINING THE SEVERITY OF A LIMITATION

"In sequential evaluation step two, the [Commissioner] determines whether a claimant has a 'severe' impairment or combination of impairments that causes more than a minimal limitation on a claimant's ability to function." *Davis v. Shalala*, 985 F.2d 528, 532 (11th Cir. 1993). The regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a); *see also Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).

Where a claimant alleges multiple impairments, the Commissioner must consider the combined effects of all impairments in determining disability, not merely the individual effects of the several impairments. *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987); 20 C.F.R. §§ 404.1522–1523, 416.922–923. Even where an individual impairment would not render the claimant disabled, the combination of the claimant's impairments may establish disability. *Caulder v. Bowen*, 791 F.2d 872, 880 (11th Cir. 1986). Statements from an ALJ that the claimant "did not have an impairment or combination of impairments" that met the listings constitute evidence that he considered the combination of a claimant's impairments. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002); *see also Jones v. Dep't of Health & Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986).

## V. FACTS

The claimant has a high school education and was forty-three years old at the time of the administrative hearing. (R. 132, 92, 100). His past work experience includes employment as a laborer, loader, cook, dishwasher, stocker, mental health worker, and material handler. (R. 139). The claimant originally alleged that he was unable to work because of snapping iliopsoas tendon syndrome, chronic hip pain, and lower back problems. (R. 68–69). On appeal, however, the claimant argued that, in addition to the impairments listed previously, he was disabled because of his obesity, hypertension, and a mental impairment. (R. 27–32). The claimant argues that the ALJ did not properly base his decision on adequate medical sources and that the ALJ inappropriately determined the severity of the claimant's limitations. The claim alleges that he has not worked since the onset of his disability on December 17, 2003. (R. 111–12).

6

A. PHYSICAL LIMITATIONS

(i) *Medical Records Prior to Disability*

On June 8, 2000, Dr. Solorio examined the claimant for complaints of back pain. The claimant reported that his back pain began in 1984 while playing basketball, and that lifting at work had aggravated his symptoms. He reported a history of emergency room visits for pain medication. Dr. Solorio noted that the examination revealed a "mildly obese male in no acute distress" who could "ambulate[] without difficulty," and had "[m]otor strength [of] grade 5/5." While Dr. Solorio did observe a distinct popping noise emanating from the claimant's lower back, the claimant's lumbar X-rays were "unremarkable." His overall impression was that the claimant had spinal instability. Dr. Solorio ordered additional X-rays of the lumbar spine and the hip as a result. (R. 174, 180).

On July 13, 2000, the claimant returned to Dr. Solorio for a follow-up visit, complaining of persistent back pain. The claimant reported that he was unable to continue performing the previous work he had done at CareLine. The claimant also revealed that he was unable to walk for two weeks after his basketball injury in 1984. The X-rays Dr. Solorio ordered of the pelvis, hip, and spine "reveal[ed] no evidence of instability." Dr. Solorio's overall impression was that the claimant had iliopsoas tendon snapping syndrome. (R. 174–75, 180–81).

After calling in periodically for Lorcet Plus refills, the claimant returned again to Dr. Solorio on August 30, 2000 for an examination. The claimant reported that his current work capacity involved "no lifting over 5 lbs, no bending, no reaching overhead, sitting 30 minutes and no more than 15 minutes of standing rotating on 8 hour shift." Dr. Solorio noted that the back and left hip pain is "most likely going to be related to a snapping iliopsoas tendon," which was

7

evident in the popping noise Dr. Solorio observed. Dr. Solorio ordered an MRI of the claimant's iliopsoas tendon to look for evidence of inflammation before making a diagnosis. (R. 175, 181).

Before returning to Dr. Solorio for a follow-up, the claimant went to Dr. Steven M. Theiss for an examination on November 13, 2000. Dr. Theiss noted that the claimant was a "healthy appearing gentleman with a normal gait who c[ould] heel and toe walk without difficulty." Dr. Theiss also reviewed an MRI of the claimant's hip and noted that it was "unremarkable," although lumbar films revealed some sclerosis in the claimants' sacroiliac joints. Ultimately, Dr. Theiss's impression was that the claimant suffered from both back pain and snapping left hip syndrome, although the two were unrelated. Dr. Theiss also stated that the claimant could consider an iliopsoas tendon release, although it would only remedy the snapping hip and not the pain the claimant reported. As far as the back pain was concerned, Dr. Theiss showed some concern about the findings in the lumbar films and stated that he "would recommend a rheumatology evaluation to evaluate [the claimant] for a seronegative spinal arthropathy." (R. 171–72).

After calling in again for more Lorcet Plus refills, the claimant returned to Dr. Solorio on January 8, 2001 for a follow- up examination. The claimant discussed Dr. Theiss's recommendations and the possibility that the claimant might have seronegative spinal arthropathy and a snapping hip syndrome. Dr. Solorio recommended avoiding the proposed iliopsoas release for now because he "believe[d] [the claimant's] biggest problem [wa]s really his back pain." He agreed with the referral for a rheumatology and provided the claimant with a refill of his prescription medication. Dr. Solorio also noted that he felt the claimant needed retraining "for work that does not involve heavy lifting, no lifting from the floor, and [which would] allow

him to change positions."(R. 176–77, 182–83).

On June 27, 2002, the claimant again returned to Dr. Solorio for an examination. The claimant reported that his back and hip pain was "generally getting worse" and revealed his intention to apply for social security disability benefits. The claimant added that although he had previously taken Lorcet Plus for pain, he stopped after he started to get addicted, choosing instead to simply "learn[] to deal with the pain." The claimant indicated he was trying to lose some weight. Dr. Solorio noted that plaintiff did not have shortness of breath or any mental instability, and that the claimant was "able to arise from the examining table without difficulty." Dr. Solorio recommended not doing the surgery at this point, but admitted that he did not have much experience with this type of procedure and suggested that the claimant return to UAB Orthopedic Clinic for further investigation. (R. 177, 183).

### (ii) *Medical Records After Alleged Onset of Disability: Incarceration*

Medical records from the Federal Bureau of Prisons indicate that from 2004 to 2006, the claimant was incarcerated.[2] In a record dated February 19, 2004, a registered nurse reported that the claimant had "moderate back pain" and was taking Naproxen. (R. 240, 242). In a record dated May 27, 2004, a mid-level practitioner marked the claimant's current pain level as a two on a scale of one to ten, indicating mild pain. (R. 238). The report also indicates that the claimant lost 30 pounds while in prison. In a record dated January 19, 2005, the claimant rated his pain at a six out of ten and exhibited limited flexion, extension, and lateral movements. K. Bennett, an

---

[2] The exact dates of the claimant's incarceration are unclear from the record. The ALJ states that the claimant was incarcerated from February 2004 to July of 2006, which is also supported by the medical records for the time period. (R. 32). However, the claimant reported applying for social security disability benefits a day after his release in April of 2007. (R. 250, 252).

Advanced Registered Nurse Practitioner (ARNP), noted that the claimant had spasms during the movements and exhibited a mild limp when walking. (R. 231).

In a record dated on June 28, 2005, the claimant reported to the medical unit for "severe back pain." When asked if he was in pain, claimant answered "Yes, bad." When asked to rate the pain, the claimant put a ten out of ten, and when asked how long he had had this problem, the claimant marked "years." The claimant's weight at the time was 190 pounds. (R. 236).

In a record dated July 15, 2005, Dr. J. Hudgins measured claimant's weight at 200 pounds and marked the claimant's pain to be at a 6 out of 10 on the pain scale. The claimant reported that the pain was worse in the morning, and that during the day, the pain would radiate down his leg. Dr. Hudgins noted that the claimant's lumbar and hip regions were locally tender, and prescribed Naproxen and back strengthening exercises. (R. 234).

On August 1, 2005, K. Bennet, an ARNP, examined the claimant. She noted that the claimant has experienced persistent lumbar and hip pain, "ongoing for several years, #7/10 scale." Despite indicating a high level of pain, the claimant also reported "[r]unning on rec yard for 30 minutes at a time" and "play[ing] basketball on [S]at[urday]." The claimant's weight at the time was 200 pounds. When instructing the claimant to take his medication with food, the ARNP noted that he exhibited "no barriers to learning." (R. 233).

On August 29, 2005, Dr. Lowry examined the claimant and noted that he weighed 205 pounds and reported pain at a seven out of ten. Dr. Lowry also observed that the claimant grunted when he sat down and limped as he walked. Upon examining him, he also noted tenderness in the lumbar and hip region. (R. 232).

On April 14, 2006, K. Bennett Baker, ARNP, again examined the claimant. The ANRP noted that the claimant weighed 189 pounds, describing his build as medium. (R. 226). She noted the claimant was not currently on any medication and had a history of chronic back and hip pain. She prescribed the plaintiff some hydrochlorothiazide, a pill that prevents the body from absorbing too much salt and is used to treat high blood pressure. (R. 227). She instructed the claimant to lower his fat and cholesterol intake. She diagnosed the claimant with chronic lower back pain and hypertension. (R. 222, 228). The ARNP also noted, however, that the claimant has "lost a substantial amount of weight since arrival," and that he "[e]xercise[d] 30 minutes daily." (R. 223). Concerning the claimant's mental health, the ARNP noted that he admitted feeling sad and depressed at times, especially when his girlfriend stop contacting him. Overall, the ARNP determined the claimant was still qualified for regular duty and regular housing. (R. 218–23, 226–28).

On July 7, 2006, Ms. Bennett-Baker, an ARNP, examined the claimant and reported that the claimant was 181 pounds, 5 feet seven inches tall, with hypertension, and pain at a five on a scale of one to ten. The ARNP reported that the claimant has chronic lower back pain that became "worse when sitting [and] bending." Claimant reported feeling stiff after sitting for long periods of time, and reported not taking over-the-counter medications because they do not help. (R. 211).

(ii) *Medical Records After Alleged Onset of Disability: Post-Incarceration*

After his release, the claimant went for an examination at the Community Free Clinic on May 24, 2007. The examining physician[3] reported the claimant weighed 198 pounds and had

---

[3] The signatures were illegible, but the form indicates it was signed by a physician.

back and hip pain. The physician prescribed him medication for pain. (R. 246–48).

On June 28, 2007, the claimant again went to the Community Free Clinic. He still weighed 198 pounds and requested a refill of his medication and a review of his X-rays. The physician noted the pain continued but was relieved with medication and that the X-ray showed "no acute injury." The physician indicated that no return visit would be necessary. (R. 247).

On June 19–20, 2007, the claimant had a vocational evaluation at the Tennessee Valley Rehabilitation Center. In the vocational evaluator's summary, claimant "reported that he would prefer receiving a disability check than to re-train for a new career due to the constant pain that he endures," but that even "if he [wa]s approved for disability he [wa]s interested in part-time employment that would be suitable for his physical condition." Similarly, "if he [wa]s denied for social security benefits, [the claimant stated] he would be interested in re-training to enter a new career." The claimant voiced interest in "working with people in a mental health setting, working with animals or working in a light production assembly setting." Although the claimant asserted that he was under a restriction of "not sitting or standing for more than 30 minutes and not lifting more than five pounds of weight," the vocational evaluator targeted various jobs that the claimant might be both interested in and capable of performing. (R. 255–277).

The claimant had a consultative examination on July 20, 2007 performed by Dr. Bharat K. Vakharia. Dr. Vakharia described the claimant as a young man, weighing 219 pounds, measuring 67 inches tall, and who was generally in "mild distress." Dr. Vakharia observed that the claimant had "tenderness [in the] lumbrosacral spine, [and] also tenderness on the left hip at iliac crest area." In addition, Dr. Vakharia reported "movement of left leg [was] severely painful." Although the claimant could walk, he reportedly "had difficulty walking on the heel."

12

Dr. Vakharia also noticed that movement of the knee was limited "because of the left hip and back pain." He reported that the claimant was on 10 milligrams of Flexeril, 500 milligrams of Naproxen, and 50 milligrams of Ultram. Ultimately, Dr. Vakharia determined the claimant has lower back pain and hip pain. In examining the claimant's range of motion, Dr. Vakharia determined the claimant's range of motion in his dorsolumbar spine, hips, and knees was significantly reduced because of lower back pain, with the claimant's left side experiencing the greatest limitations. (R. 199–202).

(iv) *Residual Functional Capacity Determination*

On July 32, 2007, Cassandra Brown, a disability benefits employee, completed the claimant's Residual Functional Capacity assessment after having "consulted with Dr. Shugerman." (R. 210). Ms. Brown found that the claimant could occasionally lift 20 pounds (less than one-third of the entire work day); frequently lift up to 10 pounds (less than two-thirds of the entire work day); stand, walk, or sit each for about 6 hours in an 8 hour workday; and push or pull without limitation "other than as shown for lift and/or carry." (R. 204). Ms. Brown based this determination on the claimant's consultative examination with Dr. Vakharia, which demonstrated that the claimant could breathe, walk, and move with some range of motion. ( R. 205). In addition, Ms. Brown looked to the claimant's 2000 X-ray, which was described as "unremarkable" and which evidenced no instability. (R. 205, 174–75, 180–81).

In determining the claimant's postural limitations, she concluded that the claimant could climb ramps and stairs frequently (less than two-thirds of the time); never climb ladders, ropes, or scaffolds; and balance, stoop, kneel, crouch, and crawl occasionally (less than one third of the time). (R. 205). Additionally, the examiner noted no manipulative limitations, which included

13

reaching in all directions; no visual limitations; and no communicative limitations. (R. 206–07). Similarly, the only environmental limitations noted in the RFC assessment were to avoid concentrated exposure to extreme cold and extreme heat and to avoid all exposure to hazards. (R. 207).

In completing her assessment, Ms. Brown found the "claimant's statement about his symptoms and functions limitation [only] partially credible as the alleged severity [wa]s not totally consistent with the objective findings from the evidence in the file." *Id.* at 208.

(v) *Miscellaneous Medical Records*

On May 21, 2009, the claimant went to Dr. Putnam, who treated the claimant for left side testicular pain and chronic back pain. Dr. Putnam noted the claimant's weight was 256 pounds and that he had gained a good deal of weight since prison. Dr. Putnam described the claimant's problem as being overweight with chronic back and hip pain, leg cramps on both legs, and pain in the testes. Dr. Putnam also noted the claimant had high blood pressure in the past. Ultimately, Dr. Putnam gave the claimant prescriptions for Tramadol and Flexeril. (R. 336–41).

From August 15, 2009 through October 22, 2009, the claimant's records indicate that the claimant made approximately eight emergency room visits for treatment of an abscess (likely due to a bug bite) on the claimant's abdomen, (R. 303–13, 297, 301–07, 298–99, 314–18, 321–25), and injuries related to a gunshot wound in the claimant's left leg, (R. 286–91, 328–29, 282–83, 326–27). The physicians drained the abscess, gave the claimant pain medication, and did not indicate that further treatment of the abscess would be necessary. (R. 297, 301–07, 321–25). Similarly, although the claimant experienced residual tenderness from his gunshot wound, likely

14

due to the bullet fragment purposefully left in his leg, the physicians merely gave the claimant

pain medication and noted that the wound was healing well. (R. 282–84).

On December 17, 2008, Dr. Putnam again examined the claimant, noting that the

claimant had lower torso pain and had gained a significant amount of weight. Dr. Putnam gave

the claimant prescriptions for Nuvigil, Tramadol, Cyclobenezine. (R. 332–35).

B. MENTAL LIMITATIONS

On April 13, 2007, Dr. Jon G. Rogers, Ph.D., gave the claimant a mental health

evaluation. (R. 249–254). He noted that the claimant experienced irritability, difficulty falling

asleep, fear of losing control and going crazy, unstable interpersonal relationship, impulsivity,

and anger management issues. (R. 249). During this examination, the claimant reported getting

up at 7:00 a.m. and going to bed at 11:30 p.m. His days were reportedly filled with

housecleaning, washing the clothes, cooking the meals, washing the dishes and cleaning the

house. His reported hobbies included playing sports and walking. (R. 250).

Dr. Rogers observed that the claimant's attitude was cooperative, his "[s]tream of talk

was normal," and his judgment and insight were "fair to poor." Dr. Rogers reported that the

claimant's IQ was 94, placing him in the "average range intellectually." Other test scores

revealed the claimant suffered in math and spelling "to the extent that it indicate[d] significant

learning disabilities." In assessing the claimant's work-related mental health, Dr. Rogers

concluded that the claimant could exchange money, although his "[s]ocial response will be below

average." More importantly, Dr. Rogers concluded that the claimant was "capable of being

cooperative with peers and supervision and maintaining a routine work cycle." Overall, the

claimant's "[m]otivation seemed [g]ood," even though his "[r]esponse to frustration w[ould] be

15

poor," and his "[c]ommunication skills, physical, and mental stamina [we]re below average." (R. 251).

Dr. Rogers' diagnostic impression was that the claimant suffered from a learning disorder in spelling, a mathematics disorder, cocaine dependence, cannabis abuse, and alcohol dependence. He also concluded that the claimant suffered from a personality disorder with anti-social features. Regarding the claimant's physical problems that may affect mental health, Dr. Rogers noted that the claimant suffered from headaches, high blood pressure, and daily pain rated at a level of eight out of ten. Dr. Rogers concluded that all of these impairments in combination with the claimant's psychosocial stressors stemming from difficult relationships, his lengthy incarceration, and his readjustment to society made a Global Assessment of Functioning score of 53 appropriate for the claimant, indicating moderate symptoms. (R. 251–52).

C. THE ALJ HEARING

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested a hearing before an ALJ. (R. 70). The ALJ originally scheduled a hearing for March 26, 2009, but ultimately postponed the hearing until February 4, 2010, pending the resolution of a prior application the claimant had made for benefits. (R. 77–81, 34–38, 89–90, 39–64). The claimant, a vocational expert, and the claimant's spouse each testified at the hearing.

When asked what his worst physical problem was, the claimant answered "[m]aintaining a normal lifestyle without pain each and every day." (R. 48–49). Although the claimant stated that he tried to go walking everyday, he testified that he could not walk for a long period of time and definitely could not walk a mile. (R. 46, 51). He testified that he longest period of time he

16

could sit before getting up because of pain was "[r]ight at about 30 minutes," and the longest time he could stand before having to sit down was 15–20 minutes. (R. 50–51).

When asked what he did during the day, the claimant stated he would get up around 11:00 a.m. or 11:30 a.m. and mostly "sit around the house and watch TV, sit down, up and down, walk back and forth for a minute, sit down, up and down, [and walk] over to [his] mother's house." (R. 44, 52–53). The claimant reported visiting his mother—who lives next door to him—every day to check on her. (R. 45). When asked his hobbies, the claimant stated that he could no longer enjoy any of his previous hobbies, including playing basketball. (R. 46–47). The most he reported doing was trying to accompany his wife during her errands, though he admitted that he would usually end up going back to the car or sitting down in the store while she finished. (R. 48).

The claimant testified that at the time of the hearing, he weighed approximately 327 pounds, but that he was trying to lose weight. (R. 44–45). When asked if he could bend down and pick up something off the floor, the claimant said that he could not do it without actually getting on his knees, and that his wife has to help him put on his socks and underwear, use the bathroom, and enter and exit the bath tub. (R. 51). The claimant also testified that he had begun having muscle spasms in the leg in which he was shot. (R. 51). He testified that he was taking aspirin, Tramadol, Nuvigil, and a muscle relaxer to relieve his pain and help him sleep. (R. 44). As a side effect of these drugs, however, the claimant reported experiencing sleep apnea. (R. 51–52).

17

The claimant also testified that the last time he worked was in 2001, when he was on his feet all day assisting with "medical supply, boxing, bending, [and doing] a lot of grabbing of material." (R. 46). He admitted he was in vocational rehabilitation and was "trying to go back to school," a fact of which the attorney was not aware at the time of the hearing. (R. 50).

The vocational expert testified that he had examined the claimant's record and that the claimant would not be capable of doing his past relevant work if his pain was at a seven or above, but that he might be able to do his past relevant work if his pain was at a six or below. (R. 54–55). When asked if the claimant could perform his past relevant work if the ALJ considered the claimant's testimony at the hearing credible, the vocational expert answered, "No." (R. 55). When asked if the claimant could perform any work in the area or in the nation as a whole if the claimant's testimony were credible, the vocational expert answered, "Not based on his testimony." (R. 55).

At the claimant's insistence, his wife, Maria Thompson, also testified. (R. 56–63). She stated that the claimant has complained of pain ever since they met, thirteen years earlier. (R. 58). When asked what time the claimant awakes, she testified that it varied from day to day because the medication the claimant takes affects his ability to sleep. (R. 59). She testified that the claimant would wake up frequently in the middle of the night because he could not breathe or because he was in pain. This started happening before the claimant was shot in the leg, but had become more frequent since then. (R. 62). When asked what the claimant did to help around the house, Ms. Thompson testified that the claimant did not help her with household chores and that she usually went grocery shopping alone. (R. 60–61).

18

D. THE ALJ'S DECISION

In a decision dated March 10, 2010, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was thus ineligible for disability benefits and supplemental security income. (R. 22–33, 1). First, the ALJ determined the claimant had not engaged in substantial gainful activity since December 17, 2003, the alleged onset date for the claimant's disability. (R. 27). Second, the ALJ determined that the claimant's iliopsoas tendon snapping syndrome, hypertension, and obesity were all severe impairments "result[ing] in more than a minimal limitation on [the claimant's] ability to engage in work related activities." (R. 27). Third, the ALJ determined that the claimant did not have an impairment or combination of impairments that met the Listing of Impairments, and that even when considering both the claimant's severe and non-severe impairments, the claimant still had the Residual Functional Capacity to perform the full range of light work. (R. 27–28).

In making the claimant's RFC determination, the ALJ closely examined the claimant's medical history and determined that while the claimant's impairments could have caused the alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The ALJ pointed to the fact that the claimant's X-ray and MRI in 2000 with Dr. Solorio were clear. Additionally, Dr. Solorio did not recommend surgery and stopped treating the claimant after 2002. (R. 29).

The ALJ also pointed out that the next time the claimant sought treatment was while he was incarcerated in 2004, leaving nearly a two-year gap in treatment. In addition, even the various medical records from the prisons painted a mixed picture of the claimant's disability.

19

Although the claimant regularly complained of pain, for example, he was cleared for regular duty work and reported a pain level of only five out of ten near the time of his release. The consultative examination ordered in July of 2007 pursuant to the claimant's disability benefits application similarly made no recommended limitations for the claimant. Community Free Clinic records in April and June of 2007 further established that, while the claimant was offered prescription medication for his pain, the lumbar X-rays were negative with no acute findings. (R. 29–30).

The ALJ noted that the claimant did not seek treatment again until May of 2009, nearly another two-year gap. (R. 30). Even though the ALJ acknowledged the claimant's steady weight gain during this time,[4] the ALJ noted that Dr. Putnam's 2009 impression merely reiterated what nearly every other examining physician had determined: the claimant is obese and has chronic low back pain, relieved through prescription medication. (R. 30).

The ALJ also dismissed the claimant's emergency room records in 2009, in which claimant was treated for an abscess in his abdominal area due to a possible insect bite and the gunshot wound to his lower left leg, because the records indicate that the injuries did not impose "any more than a minimal effect upon [the claimant's] ability to engage in work." (R. 30). The records suggest the gunshot wound was healing well, and the abscess was eventually resolved.

As to the claimant's mental health, the ALJ summarized Dr. Rogers' findings—which included an assessment that the claimant has a mathematics disorder; a learning disorder; a

---

[4] In June of 2007, claimant weighed 198 pound. (R. 247). In May of 2009, the claimant weighed 256 pounds. (R. 339). In December of 2009, the claimant weighed 305 pounds. (R. 335). At the time of the hearing in February of 2010, the claimant testified that he weighed 327 pounds. (R.44).

personality disorder; a history of cocaine, cannabis, and alcohol abuse (in remission); and a GAF score of 53—and determined that they were not entitled to substantial weight. (R. 31). As grounds for determining that the claimant did not have a severe mental impairment for the purpose of social security disability benefits, the ALJ pointed out that the record shows "no prior treatment whatsoever for any mental impairments." (R. 31). In addition, the ALJ observed, "[t]he claimant did not allege having any mental impairments when he filed his applications nor did he allege having any mental impairments at the hearing." (R. 31).

The ALJ also determined that Dr. Rogers' report itself suggests the claimant's daily activities were not severely limited. The claimant reportedly did a variety of household chores regularly (much more than what he indicated at the hearing) and Dr. Rogers deemed the claimant "capable of being cooperative with peers and supervisors and maintaining a regular work schedule." (R. 31). Thus, the ALJ concluded that the claimant's personality disorder, learning disorder, and history of substance abuse—even when considered in combination with his other severe impairments—"resulted in a no more than mild restriction of daily living activities, no more than mild difficulty with maintaining social functioning, and no more than mild difficulty with maintaining concentration, persistence and pace." In consideration of all the claimant's impairments, the ALJ, therefore, determined that a Residual Functional Capacity at the full range of light work was appropriate. (R. 31).

Although in the fourth step of the analysis the ALJ determined the claimant was unable to perform any of his past relevant work, the ALJ ultimately concluded in the fifth step of the analysis that jobs exist in significant numbers in the national economy that the claimant can

perform given the claimant's Residual Functional Capacity, age, education, and work experience. (R. 32).

## VI. DISCUSSION

### A. THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY WAS BASED ON SUBSTANTIAL EVIDENCE

The plaintiff objects to the ALJ's ultimate RFC determination that he is capable of performing the full range of light work on the grounds that the ALJ's findings are not based on substantial evidence because (1) the ALJ relied upon an RFC assessment conducted by a non-medical professional, and (2) the ALJ failed to order a current consultative examination before rendering his decision. (Doc. 5 at 7).

*(i) Residual Functional Capacity Assessments Conducted by Non-Medical Professionals*

A Residual Functional Capacity is an "individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . [which] means 8 hours a day for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 (July 2, 1996). The law defines *light work* as "lifting no more than 20 pounds with frequent lifting or carrying of objects weighing up to 10 pounds"; "a good deal of walking or standing"; or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

As stated previously, the ALJ's duty to develop a full and fair record does not require the ALJ to secure a medical source opinion regarding the claimant's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); *see also Green v. Soc. Sec. Admin*, 223 F. App'x 915, 923–24 (11th Cir. 2007) (holding that the ALJ's RFC determination that the claimant could perform light work

was supported by substantial evidence even though the only evidence in the record consisted of office visit records indicating that the claimant was managing her respiration problems well, had controlled her hypertension, and that her pain could be treated with over-the-counter medicine). Instead, "the task of determining a claimant's Residual Functional Capacity and ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010). Because the ALJ makes his RFC determination based on *all* the evidence in the record, the ALJ can fulfill his responsibility to develop the record without a medical source opinion as to the claimant's RFC. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The standard remains whether the ALJ's RFC determination is supported by substantial evidence. *Green*, 223 F. App'x at 924.

Here, substantial evidence of the claimant's ability to perform light work exists in the record, even in the absence of a medical source opinion. The claimant applied for social security benefits on April 9, 2007, alleging his disability began on December 17, 2003. (R. 66, 67, 92, 112, 68–69). Despite the claimant's consistent complaints of back and hip pain from 2000 to the date of the hearing in 2010, he was cleared for regular duty and regular housing when incarcerated from 2004–2006.[5] (R. 219). The claimant's ability to perform light work is also evident from his August 2005 statement to medical personnel that he exercised thirty minutes daily and played basketball while in prison. (R. 233). The claimant also reportedly worked in the prison laundry throughout his incarceration and as a laborer for a year while on Work Release. (R. 250). Once released, the claimant told Dr. Rogers on April 13, 2007 that his daily activities

---

[5] The exact dates of the claimant's incarceration are unclear from the record. *See supra* note 4.

included washing clothes, cooking, washing the dishes, and cleaning the house, and his hobbies included attending church activities, playing sports, and walking. (R. 250).

In addition to demonstrating the physical capacity to work in a light range position, the claimant's medical treatment history does not suggest he requires limitations inconsistent with light range work. For example, the claimant has significant gaps in treatment. From December of 2003 to February of 2004, (R. 177, 183, 240, 242) and again from July 2007 to May 21, 2009, (R. 188–202, 336-41), the record shows the claimant did not seek any medical treatment for his allegedly disabling conditions. In addition, X-ray and MRI scans of the claimant's back and hips consistently showed no acute damage. (R. 174, 180, 175, 181, 171, 247). Finally, despite the sporadic frequency with which the claimant sought medical treatment for his pain, his doctors never recommended surgery and instead simply continually determined the best approach would be to prescribe medication to help relieve the pain. (R. 177, 183, 247).

The claimant's own statements also provide support for the ALJ's determination that the claimant can perform light work. In June of 2007, the claimant went through vocational rehabilitation, in which he "reported that he would prefer receiving a disability check than to re-train for a new career due to the constant pain that he endures," but "if he [wa]s approved for disability he [wa]s interested in part-time employment that would be suitable for his physical condition." If, however, the claimant's social security benefits application were denied, the claimant stated that "he would be interested in re-training to enter a new career." In discussing the kind of work the claimant would like to do, the claimant "voiced an interest in working with people in a mental health setting, working with animals or working in a light production assembly setting." (R. 259).

The ALJ's determination that the claimant has a residual functional capacity to perform the full range of light work is based on substantial evidence. *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (holding the ALJ's adverse finding was supported by substantial evidence because the claimant's physical activity and conservative medical treatment were inconsistent with the claimant's testimony about his nonexertional impairments). The claimant's demonstrated physical capacity since the alleged date of disability, his sporadic and conservative medical treatment, and his own admission that he can work all constitute substantial evidence that supports the ALJ's findings. Thus, the ALJ was under no obligation to order an RFC from a medical source.

(ii) <em>Ordering Consultative Examinations</em>

Similarly, although ordering a consultative examination may be appropriate in certain circumstances, federal regulations do not *require* the ALJ to do so. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). Instead, the regulations provide that the ALJ "*may*" order a consultative examination if the evidence is either inconsistent or insufficient to make a decision. *Id.* (emphasis added). A non-exhaustive list of circumstances in which such an examination might be appropriate include cases where "[t]here is an indication of a change in [the claimant's] condition that is likely to affect [his] ability to work, but the current severity of [the] impairment is not established." *Id.* Ultimately, however, the lack of mandatory language and the explanatory examples provided in the regulations suggest that an ALJ's RFC determination remains valid—even in the absence of a consultative examination—if supported by substantial evidence. *Robinson v. Astrue*, 365 Fed. App'x 993, 999 (11th Cir. 2010).

25

Here, the claimant appears to argue that a consultative examination was necessary because the claimant's condition had significantly changed from the time he was originally examined in July of 2007 to the time of his hearing in 2010, because of his substantial weight gain since 2007 and his 2009 gunshot wound to his left leg. (Pl. Brief, at 9).

(a) Weight Gain

While the claimant gained a significant amount of weight since he first applied for disability benefits in April of 2007[6], a consultative examination was not necessary because the record contains no indication that the weight gain was either likely to affect the claimant's functional capacity or not already adequately accounted for in the ALJ's analysis. *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Like all other impairments, obesity is only relevant to the extent it results in "functional limitation." SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Thus, even though the claimant's weight and height would likely put him in the "extreme obesity" range, "representing the greatest *risk* for developing obesity-related impairments," the ALJ can still determine the claimant has the capacity to perform light work because obesity "do[es] not correlate with any specific degree of functional loss." *Id.* Thus, in the absence of any information suggesting that the claimant's functionality has been compromised by his weight gain, the ALJ has no obligation to order a consultative examination, "as long as the record contains sufficient information for the [ALJ] to make an informed decision." *Robinson*, 365 Fed. App'x at 999 (quoting *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007)).

---

[6] *See supra* note 5.

In addition, nothing in the ALJ's opinion suggests that he did not account for the claimant's obesity. For example, the ALJ determined that both the claimant's obesity and hypertension were severe impairments. (R.27). Similarly, the ALJ referenced the claimant's steady weight gain—including his final weight of 327 pounds—prior to making his decision. (R.28). Finally, the ALJ specifically made note that Dr. Putnam did not prescribe any follow up treatment in his December 2009 examination of the claimant, despite the fact that Dr. Putnam discussed the claimant's significant weight gain during the examination. (R. 30, 335).

Ultimately, the claimant bears the "very heavy" burden of proving he is disabled, *Robinson*, 365 Fed. App'x, at 998. Because obesity alone does not necessarily affect an individual's functionality, and because the claimant has not pointed to anything more concrete than the mere *possibility* that his weight gain limited his functionality, the court determines that the ALJ had substantial evidence to find that the claimant could perform the full range of light work—even without ordering an additional consultative examination to consider the claimant's weight gain.

(b) <u>Gunshot Wound</u>

The claimant also argues that an updated consultative examination would have been appropriate because of his 2009 gunshot wound. As the ALJ pointed out, however, medical records following the injury indicated that the wound was healing well. (R. 30, 284). Additionally, at the claimant's examination with Dr. Putnam just two months after being shot, Dr. Putnam did not indicate any problems or complications existed with the wound. (R. 30, 335). Thus, the ALJ had substantial evidence to determine the gunshot wound had no lasting effect and was not a severe impairment, even without an updated consultative examination.

27

B. THE ALJ PROPERLY CONSIDERED "SEVERE" IMPAIRMENTS OF RECORD

In addition to alleging that the ALJ's Residual Functional Capacity determination is not based on substantial evidence, the claimant also alleges that the ALJ erred in his treatment of the claimant's obesity and the ALJ erred in refusing to classify the claimant's mental impairment as severe.

A severe impairment, or combination thereof, is an impairment that "significantly limits the claimant's physical or mental ability to do basic work activities." *Griffin v. Comm'r of Soc. Sec.*, No. 12–14849, 2014 WL 1045681, at *3 (11th Cir. March 19, 2014); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Although a claimant is not disabled unless he can demonstrate he suffers from a severe impairment, the determination that a severe impairment exists does not automatically result in a positive disability determination; rather, requiring the claimant to prove he suffers from a severe impairment or a combination of impairments that is severe "acts as a filter" to prevent frivolous claims from proceeding. *Griffin*, 2014 WL 1045681, at *3.

As to the claimant's suggestion that the ALJ erred in determining the severity of the claimant's obesity, this court finds the claimant's argument moot because the ALJ found that the claimant's obesity *was* a severe impairment. (R. 27). To the extent the claimant attempts to revisit arguments made previously about the way his obesity was factored into his RFC determination, this court has already addressed those arguments. Although the social security rulings recognize that obesity *can* cause functional limitations, SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002), that possibility does not change the fact that the burden remains with the claimant to prove those limitations. *Robinson v. Astrue*, 365 Fed. App'x 993, 998 (11th Cir.

2010). Ultimately, the record shows no evidence that the claimant's weight gain has resulted in any additional functional limitations; therefore, the court finds that the ALJ did not err in classifying the claimant's obesity as a severe impairment and subsequently refusing to find the claimant disabled.

As to the claimant's argument that the ALJ erred in refusing to classify the claimant's mental impairment as severe, this court holds that the ALJ properly determined that Dr. Rogers' GAF score of 53—indicating moderate limitations—and diagnosis of a mathematics disorder; a learning disorder; a history of cocaine, cannabis, and alcohol abuse; and a personality disorder were not entitled to substantial weight. (R. 31). Dr. Rogers was not the claimant's treating psychologist, and in fact only examined the claimant once pursuant to a vocational rehabilitation program. More importantly, prior to Dr. Rogers' evaluation in April of 2007, the claimant had never sought treatment for any mental impairments. (R. 31); *see Dryer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (holding that ALJ properly discredited the claimant's testimony about an impairment where the claimant could not show routine or consistent treatment). In addition, the claimant did not list any mental impairments when he filed his application or when he testified at the hearing. (R. 92, 112, 68–69, 39–64). In short, outside of Dr. Rogers' examination, the record itself is void of any indication that the claimant suffered from a severe mental impairment. *See* 20 CFR §§ 404.1508, 416.908 ("A . . . mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.").

Additionally, even Dr. Rogers' evaluation itself does not suggest that the claimant's mental impairment affects his daily activities. (R. 250). While Dr. Rogers did state that the claimant suffered from below average communication skills and that his response to frustration would be poor, he ultimately determined that the claimant is "capable of being cooperative with peers and supervision and maintaining a routine work cycle." (R. 251). Based on this evidence, the ALJ justifiably concluded that any mental impairment the claimant may have had put no more than a "mild" restriction on daily living activities, social function, and maintaining concentration, persistence, and pace. (R. 31). Because a "severe" impairment is one that *significantly* limits the claimant's ability to do basic work activities, the ALJ properly concluded that the claimant's mental impairment was not a severe impairment within the meaning of the regulations. 20 C.F.R. §§ 404.1521(a); 416.921(a).

## VII. CONCLUSION

For the reasons stated above, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED.

DONE and ORDERED this the 27th day of March, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE